**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

| | | |
|---|---|---|
| _____ | ) | TAX COURT OF NEW JERSEY |
| ML PLAINSBORO LTD PRNTSHP/ | ) | DOCKET NO. 002348-2005 |
| GOMEZ, | ) | DOCKET NO. 001620-2006 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | OPINION |
| TOWNSHIP OF PLAINSBORO, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Decided:  May 28, 2019

Frank E. Ferruggia, Esq. and Daniel P. Zazzali, Esq.
(McCarter & English, LLP, attorneys) for plaintiff

Richard M. Conley, Esq. for defendant

DeALMEIDA, J.T.C. (t/a)

This is the court's opinion after trial in the above-referenced matters challenging the local

property tax assessment on two parcels in Plainsboro Township for tax years 2005 and 2006.  For

the reasons explained more fully below, the court lowers the assessments on the subject property

for both tax years.

## I.  Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and

testimony admitted at trial.

Plaintiff ML Plainsboro Ltd Partnership is the owner of two parcels of real property in

defendant Plainsboro Township.  For tax year 2005, the parcels are designated in the records of

the municipality as Block 5.01, Lot 3.07, commonly known as 800 Scudders Mill Road, and Block

5.01, Lot 3.08, which is situated on Scudders Mill Road. Effective tax year 2006, the municipal tax assessor changed the designations on the parcels to Block 1601, Lot 2 (formerly Block 5.01, Lot 3.07), and Block 1601, Lot 4 (formerly Block 5.01, Lot 3.08). The two parcels operate as a single economic unit.

The subject property consists of 65.367 acres on which sits a three-story office building constructed in phases between 1985 and 1994.[1] The court finds that the subject property has 698,722 square feet which would be rentable to a single tenant, including 33,124 square feet of cafeteria space, but excluding 32,545 square feet of below grade storage space. A cooling tower, which is integral to the office building, is located on Lot 4 (formerly 3.08). The subject property includes three pods of office space. Phase 1, built in 1985, contains pods A-E, which comprise about sixty percent of the improvements at the subject property. Phase 2, built in 1990, contains pods F-H, which comprise about thirty-one percent of the improvements at the subject property. Phase 3, built in 1993, contains pod I, with approximately nine percent of the improvements at the subject property. The office space includes ten passenger elevators, two freight elevators, and a lobby area with granite floors. Each pod has its own restrooms and elevators. The subject property includes 2,210 parking spaces, 493 of which are under the building. The elongated configuration of the building creates long distances from the remote parking to the visitor's reception area.

On the relevant valuation dates, the subject property was owner occupied. The improvements were previously part of a larger complex designed by a single corporate user, Merrill Lynch, the financial services company. The original complex included first-class office

---

[1] For the relevant tax years, a 107.37-acre portion of Block 5.01, Lot 3.08 (later Block 1601, Lot 4) was assessed as farmland. That aspect of the assessment is not before the court. To the extent that the findings of fact in this opinion differ from those in the court's January 15, 2018 letter opinion, this opinion controls.

2

space, an executive suite, a hotel conference and training center for Merrill Lynch personnel, and other amenities consistent with a showcase corporate campus. In the years after construction, however, Merrill Lynch's presence at the subject property waned, and the improvements aged to average condition. As of the valuation dates, these changes caused the subject property to lose its character as a premier corporate campus.

In addition, on July 30, 2004, shortly before the first valuation date, a portion of the original complex, the hotel conference and training center, was sold to 900 Scudders Mill Road Associates, LLC for $25,325,382. The sale included a number of easements and agreements regarding the sharing of equipment for heating, ventilating, and air conditioning serving the subject property. The transaction effectively left the subject property a large office building attached to a hotel conference center owned by another party. The assessment on the hotel conference and training center property is not before the court.

For tax year 2005, Block 5.01, Lot 3.07 was assessed as follows:

| | |
|---|---|
| Land | $ 22,300,000 |
| Improvement | $167,700,000 |
| Total | $190,000,000 |

Block 5.01, Lot 3.08 was assessed as follows:

| | |
|---|---|
| Land | $ 3,708,500 |
| Improvement | $ 3,200,000 |
| Total | $ 6,908,500 |

Because the municipality implemented a district-wide revaluation for tax year 2005, the Chapter 123 average ratio for tax year 2005 is presumed to be 100% and the assessments are presumed to

reflect true market value. See N.J.S.A. 54:1-35a. The total assessed value of the subject property for tax year 2005 is $196,908,500 ($190,000,000 + $6,908,500 = $196,908,500).[2]

The assessments on the parcels remained the same for tax year 2006. The Chapter 123 average ratio for the municipality for tax year 2006 is 98.68%. When the average ratio is applied to the assessments, the implied equalized value of Block 1601, Lot 2 (formerly Block 5.01, Lot 3.07) is $192,541,548 ($190,000,000 ÷ .9868 = $192,541,548), and for Block 1601, Lot 4 (formerly Block 5.01, Lot 3.08) is $7,000,912 ($6,908,500 ÷ .9868 = $7,000,912). This results in a total assessed value of $199,542,460 for tax year 2006 ($192,541,548 + $7,000,912 = $199,542,460).

Plaintiff filed Complaints in this court challenging the tax year 2005 and 2006 assessments. Defendant filed a Counterclaim for tax year 2005. The matters were consolidated for trial.[3]

The matter was tried over eighteen days. During trial, each party presented an expert real estate appraiser who offered an opinion of the true market value of the subject property on the two valuation dates, October 1, 2004, and October 1, 2005. Their opinions of value are summarized as follows:

| Tax Year | 2005 | 2006 |
|---|---|---|
| Valuation Date | 10/1/2004 | 10/1/2005 |
| Plaintiff's Expert | $ 99,000,000 | $109,000,000 |
| Defendant's Expert | $214,500,000 | $223,000,000 |

---

[2] Because the parcels operate as a single economic unit, the aggregate true market value of the parcels is determined for purposes of analyzing the validity of the assessments. See Jaydor Corp. v. Twp. of Millburn-Short Hills, 17 N.J. Tax 378 (Tax 1998).

[3] In 2007, plaintiff sold the subject property in an arms' length transaction for $107,000,000 and leased it back for $16 per square foot for a year, with an option to extend. The parties' experts had divergent views on the evidentiary value of the 2007 sale. Because the sale was after the valuation dates, and the record contains sufficient evidence with which to determine true market value, the court makes no findings with respect to the 2007 transaction.

Plaintiff's expert opined that the highest and best use of the subject property on the valuation dates was to be rented as corporate office space to a single tenant. He therefore used the income capitalization approach to reach an opinion of true market value. The expert considered and rejected the notion that the subject property is a special purpose property designed as a unique corporate campus for which the cost approach was the appropriate method to determine true market value. He also opined that the subject property had a typical office finish with adequate amenities that were too old to be amenable to the cost approach to valuation. Although plaintiff's expert did not use the comparable sales approach to determine value, he considered the 2007 sale of the subject property as corroboration of the value he reached under the income capitalization approach.

Defendant's expert opined that the subject property's highest and best use was as a special purpose, owner-occupied corporate campus for which the cost approach was the most appropriate method to determine value.[4] In reaching her opinion of true market value, defendant's expert did not independently calculate a reproduction cost new of the improvements at the subject property. She instead relied on a reproduction cost new formulated by another expert who used computer software to formulate his cost estimate (the "cost expert"). Defendant's expert depreciated the cost expert's estimate to account for the age of the improvements, which resulted in physical deterioration and other forms of obsolescence. Defendant's expert also used the actual costs of constructing the subject property and trended those figures forward to the relevant valuation dates to corroborate her findings. As is necessary under the cost approach, defendant's expert also determined a land value, which she added to the depreciated cost estimate to arrive at an opinion of value for both valuation dates.

---

[4] Although defendant's expert opined that the subject property operated as a single economic unit with the hotel conference and training center, which was owned by a separate entity, she valued the subject property as a stand-alone, single-user office building.

Defendant's expert determined that it would not be possible to identify truly comparable sales, but undertook a sales comparison analysis to estimate "a very broad range of value for the subject property, and to test the reasonableness of" the value she reached under the cost approach. The expert also discounted the income capitalization approach because of the difficulty finding truly comparable rents in the marketplace. She did, however, identify a number of corporate rents to demonstrate a range of rent levels for a large corporate property. The expert used that data to test the reasonableness of her estimate of value under the cost approach. She testified that her conclusions of value using the sales comparison and income capitalization approaches could not independently be used to determine the true market value of the subject property.

At the close of trial, plaintiff moved to strike the opinions of value offered by defendant's expert because, among other things: (1) the reproduction cost new of the cost expert, on which she relied to form her opinion of value, is a net opinion; and (2) the land sales on which she relied to determine a land value are, as a matter of law, not comparable to the subject. On January 18, 2018, the court issued a written opinion denying plaintiff's motion with respect to the land sales and denying without prejudice plaintiff's motion with respect to the reproduction cost new. The court held that it would determine the credibility of the opinion of defendant's expert after consideration of all of the evidence adduced at trial. The parties thereafter filed post-trial briefs.

## II. Conclusions of Law

The court's analysis begins with the well-established principle that "[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of

6

proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."

[Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citations omitted)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, 100 N.J. at 413 (citing Powder Mill I Assocs. v. Twp. of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. W. World, Inc., 111 N.J. 222 (1988). This presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcon. Gas Pipe Line Corp. v. Twp. of Bernards, 111 N.J. 507, 517 (1988).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Twp. of Little Egg Harbor v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998); see City of Atl. City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW Real Estate Fund, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that

7

evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" W. Colonial Enters., LLC v. City of E. Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)), aff'd, 21 N.J. Tax 590 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38 (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making a value determination. Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 312 (1992); Glob. Terminal & Container Servs. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

The court concludes that the opinions of value offered by plaintiff's expert, which were based on an accepted methodology for determining value and on evidence of the type often used for such determinations, if accepted as true, raise doubt in the court's mind with respect to whether the assessments on the subject property exceeded its true market value for tax years 2005 and 2006. As explained above, plaintiff's expert opined that the subject property's true market value was approximately half of the assessments for each tax year. Thus, the presumption of correctness attached to assessments has been overcome.

The court's inquiry, however, does not end here. Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., 127 N.J. at

8

312 (quotation omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . ." Id. at 314-15 (citing Pantasote, 100 N.J. at 413).

A.    Highest and Best Use.

A determination of true market value requires a determination of the property's highest and best use on the relevant valuation dates. In Clemente v. Twp. of S. Hackensack, 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015), now Presiding Judge Andresini succinctly explained the legal precedents that guide this court in making a highest and best use determination:

> For property tax assessment purposes, property must be valued at its highest and best use. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 300-01 (1992). "Any parcel of land should be examined for all possible uses and that use which will yield the highest return should be selected." Inmar Associates, Inc. v. Township of Edison, 2 N.J. Tax 59, 64 (Tax 1980). Accordingly, the first step in the valuation process is the determination of the highest and best use for the subject property. American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 550 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000). "The concept of highest and best use is not only fundamental to valuation but is a crucial determination of market value. This is why it is the first and most important step in the valuation process." Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b. per curiam, 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992); see also Gen. Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005).
>
> The definition of highest and best use contained in The Appraisal of Real Estate, a text frequently used by this court as a source of basic appraisal principles, has remained relatively constant for all of the years under appeal. Highest and best use is defined as:
>
> > The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.

9

[Appraisal Institute, The Appraisal of Real Estate, 22
(13th ed. 2008).]

The highest and best use analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive. Ford Motor Co., 10 N.J. Tax at 161; see also The Appraisal of Real Estate at 279. Implicit in this analysis is the assumption that the proposed use is market-driven; in other words, that it is determined in a value-in-exchange context and that there is a market for such use. WCI-Westinghouse v. Township of Edison, 7 N.J. Tax 610, 616-17 (Tax 1985), aff'd o.b. per curiam, 9 N.J. Tax 86 (App. Div. 1986). A highest and best use determination is not based on value-in-use because the determination is a function of property use and not a function of a particular owner's use or subjective judgment as to how a property should be used. See Entenmann's Inc. v. Borough of Totowa, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use of an improved property is the "use that maximizes an investment property's value, consistent with the rate of return and associated risk." Ford Motor Co., 127 N.J. at 301. Further, the "actual use is a strong consideration" in the analysis. Ford Motor Co., 10 N.J. Tax at 167.

Highest and best use is not determined through subjective analysis by the property owner. The Appraisal of Real Estate at 279. The proper determination of highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses. See Six Cherry Hill, Inc. v. Township of Cherry Hill, 7 N.J. Tax 120, 131 (Tax 1984), aff'd, 8 N.J. Tax 334 (App. Div. 1986). Additionally, the proposed use must not be remote, speculative, or conjectural. Id. If a party seeks to demonstrate that a property's highest and best use is other than its current use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence. Penns Grove Gardens, Ltd v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., 10 N.J. Tax at 167. Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently. Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983).

As noted above, the parties' experts offered conflicting opinions with respect to the highest and best use of the subject property. The court concludes that plaintiff's expert offers the most

credible opinion on this point. It is not disputed that the subject property was designed and constructed as an impressive, state-of-the-art corporate campus for Merrill Lynch with significant amenities and impressive features. However, over the years, Merrill Lynch's use of the property lessened. The improvements aged over time and, as of the valuation dates, the subject property was more akin to ordinary office space than a signature corporate campus. Designed for a single user, the subject property is most suitable for rental to a single tenant.

More significantly, just prior to the first valuation date, the hotel conference and training center portions of the improvements were severed from the subject property and sold to a third party. Thus, while the subject property was once part of an integrated corporate campus, this transaction separated the subject property from the hotel conference and training amenities. While located immediately adjacent to the subject property, those amenities are no longer under unified ownership with the subject. The corporate campus was, in effect, disassembled in the 2004 transaction. The court finds credible the expert's opinion that a single user seeking a corporate campus setting is unlikely to rent the subject property, given its entanglement with the adjoining hotel conference and training center owned by another entity. The subject property instead will be most productive as rental property to the typical officer user.

B.    Approaches to Valuation.

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11ᵗʰ ed. 2006). "There is no single determinative approach to the valuation of real property." 125 Monitor St., LLC v. City of Jersey City, 21 N.J. Tax 232, 237-38 (Tax 2004) (citing Samuel Hird

11

& Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Cont'l Baking Co. v. Twp. of E. Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominant approach will depend upon the facts of each case and the reaction of the experts to those facts." Id. at 238 (citing City of New Brunswick v. Div. of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Twp. of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

The comparable sales approach "usually provides the primary indication of market value in appraisals of properties that are not usually purchased for their income-producing characteristics." Appraisal Institute, The Appraisal of Real Estate, 419 (12th ed. 2001). This method of valuation has been defined as "[a] set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sales prices of the comparables based on the elements of comparison." Id. at 417.

The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Vill. Apartments Co. v. Twp. of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed 2008). This approach generally applies to real property that generates income from the rental of the property, not from the business activities that take place at the property.

The cost approach is normally relied on to value special purpose property or unique structures for which there is no market. Borough of Little Ferry v. Vecchiotti, 7 N.J. Tax 389, 407 (Tax 1985); Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 452 (Tax 1980), aff'd, 180

12

N.J. Super. 366 (App. Div.). The cost approach "involves a replication, through the use of widely accepted cost services . . . of the cost of the components of the building to be valued, less . . . depreciation[s]." Gale & Kitson Fredon Golf, LLC v. Twp. of Fredon, 26 N.J. Tax 268, 283 (Tax 2011) (quotation omitted). "A cost approach has two elements – land value and the reproduction or replacement cost of the buildings and other improvements." Int'l Flavors & Fragrances, Inc. v. Borough of Union Beach, 21 N.J. Tax 403, 417 (Tax 2004). Depreciation from all causes is deducted from the reproduction cost new. Depreciation is defined as a loss in value from three causes: physical depreciation, functional obsolescence, and external economic factors. The cost approach is most effective when the property being valued is new, in light of the difficulties in accurately estimating the various components of depreciation. See Worden-Hoidal Funeral Homes v. Borough of Red Bank, 21 N.J. Tax 336, 338 (Tax 2004).

In light of the court's determination that the subject property's highest and best use is for rental in the office market, the court concludes that the income capitalization approach is the most credible method for determining the subject property's true market value. The court concludes that the cost approach, on which defendant's expert primarily relied, is not a credible approach to determine the value of the subject property. The features of the subject property are "not truly unique." Ford Motor Co., 127 N.J. at 299 (quoting Sunshine Biscuits, Inc. v. Borough of Sayerville, 4 N.J. Tax 486, 495 (Tax 1982)). Once a premier corporate campus, the subject property, as of the valuation dates, was, as plaintiff's expert aptly testified, a row of office buildings connected by a common corridor. In addition, given the age of the subject property on the relevant valuation dates, depreciation would be difficult to calculate with precision under the cost approach.

Moreover, as noted above, the reproduction cost new on which defendant's expert relied was formulated by the cost expert through the use of software. It was clear during the cost expert's

testimony that he was unaware of how the software determined reproduction costs. He did not "produce independent testimony to authenticate and explain the calculations used by the automated valuation software[,]" leaving the court "unable to ascertain the underlying data, basis, or reasoning in the generation of such estimates." Forsgate Ventures IX, LLC v. Twp. of S. Hackensack, 29 N.J. Tax 28, 45 (Tax 2016), aff'd, ___ N.J. Tax ___ (App. Div. 2018). The expert, in effect, had data entered into the software, generating a replacement cost without verifying its accuracy. This undermines the value of the computer-generated figure, given that "[t]o date there has been no demonstration in any court that the calculations produced by the software are reliable." Palisadium Mgmt. Corp. v. Borough of Cliffside Park, 29 N.J. Tax 245, 263 (Tax 2016), aff'd, 456 N.J. Super. 293 (App. Div. 2018).

The cost expert also admitted to interpolating some costs when the software did not have an exact entry for a component of the subject property, taking other short cuts, and estimating some costs extemporaneously. Defendant's expert was either not aware of these techniques or took no steps to determine their credibility. In addition, the cost expert testified that his son entered the necessary data into the software program, a task requiring the son to interpret his father's notes. The record contains no evidence establishing that the expert's son accurately entered the relevant data and correctly interpreted his father's handwritten notes.

The testimony of defendant's expert also revealed that she trended the actual costs for all of the improvements from 1992 to 2004. Yet, sixty percent of the improvements were completed by 1985, and ninety-one percent of the improvements were completed by 1990. She conceded during her testimony that had she trended the costs from the actual completion dates, the divergence between the trended actual costs and her opined overall reproduction costs was at a higher percentage than the range she deemed reliable. Finally, the comparable land sales

14

defendant's expert used in her cost approach analysis were of parcels that primarily did not have the same highest and best use she attributed to the subject property. Only two of her comparable land sales were large enough to fit the subject property, and all but one required adjustments of greater that thirty-five percent. Significant adjustments to comparable sales suggest a lack of comparability and present a misleading indication of value. See Glob. Terminal & Container Servs., 15 N.J. Tax 698 (affirming the Tax Court's rejection of comparable sales because of the magnitude of adjustments). For these reasons, the court concludes that the opinion of defendant's expert, which is primarily based on the cost approach, is less credible than that offered by plaintiff's expert.

C. Calculation of Value Using Income Capitalization Approach.

Determining the value of real property pursuant to the income capitalization approach can be summarized as follows:

> Market Rent
> x Square Footage
> Potential Gross Income
>
> - Vacancy and Collection Losses
> Effective Gross Income
>
> - Operating Expenses
> Net Operating Income
>
> ÷ Capitalization Rate
> Value of Property

See Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999); Appraisal Institute, The Appraisal of Real Estate 466 (13th ed 2008).

1. Market Rent.

"Central to an income analysis is the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments, 108 N.J. at 270. This differs

from the actual rental income realized on the property, which may be below market rates. Parkview Vill. Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). However, actual income is a significant probative factor in the inquiry as to economic income. Id. at 30. "Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area." Ibid.

Plaintiff's expert had an impressive amount of experience in the office rental market. An appraiser for thirty years at the time he reached his value conclusions, the expert was the Executive Vice President of a large real estate valuation firm. During his years of practice, he appraised in excess of one hundred office buildings in New Jersey. He searched both the Princeton office market, where the subject property is located, and the regional central New Jersey office market for comparable leases. He calculated an effective rent for each lease, taking into account periodic step-ups and periods of free rent.

Plaintiff's expert made a number of adjustments to the comparable lease rents, including physical condition adjustments, tenant allowance adjustments, and adjustments to bring a number of the comparable lease rents to net status, which the expert opined was typical for the office rental market. See N.J. Indus. Props., Inc. v. Y.C. & V.L., Inc., 100 N.J. 432, 434 (1985) (explaining that in triple net leases tenants pay all but a few expenses, resulting in a lower monthly base rent); Am. Cyanamid Co. v. Twp. of Wayne, 17 N.J. Tax 542, 572 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000). Plaintiff's expert opined a market rent of $16.00 per square foot on a net basis for both tax years for the office space and $8.00 per square feet for the below grade storage space.

The court finds the comparable leases and adjustments offered by plaintiff's expert to be credible and supported by market data with respect to his conclusions for both office space and

16

storage space at the subject property. The evidence introduced at trial supports the expert's opinion and defendant's cross-examination of plaintiff's expert did not undermine his analysis or conclusions in any significant way.

2.      Building Size.

The parties offered conflicting testimony with respect to the rentable space at the subject property. The court concludes that plaintiff's expert offered a credible analysis of the subject property's rentable area after having inspected the property. His figures, as detailed above, are found to be accurate.

3.      Vacancy and Collection Rate.

A determination of value under the income-capitalization approach must include "a vacancy and loss allowance over the economic life of the property, using, in some measure, the actual history, but placing more emphasis on the trends in the most recent years." First Republic Corp. of Am. v. Borough of E. Newark, 16 N.J. Tax 568, 580 (Tax 1997), aff'd, 17 N.J. Tax 531 (App. Div. 1998). "The important principle implicated in the estimate of a vacancy and loss allowance is that the estimate is simply the appraiser's informed judgment of the long-term quality and durability of the income stream." Ibid. As Judge Crabtree explained:

> [The] determination involves more than uncritical acceptance of the vacancy rates prevailing in the subject on the valuation dates or, for that matter, the office building vacancy rates prevailing in the subject's market area. Rather, a vacancy allowance must be predicated on an estimate of the long-term quality and durability of the rental income stream.
>
> [Univ. Plaza Realty Corp. v. City of Hackensack, 12 N.J. Tax 354, 369 (Tax 1992), aff'd, 264 N.J. Super. 353 (App. Div.).]

Plaintiff's expert examined vacancy statistics for the South Middlesex submarket of the office market for the relevant tax years. He opined a vacancy and collection rate of ten percent for both tax years. The court finds the expert's opinion on this point to be credible.

4.      Operating Expenses.

Having found the triple net market rent opined by plaintiff's expert to be credible market rent for the subject property, the court must limit market expenses to the few costs incurred by a property owner receiving triple net rent. Plaintiff's expert opined a stabilized capital reserve for typical capital costs, such as parking lot and roof replacement at two percent of estimated gross income. In addition, he opined costs for management fees, leasing commissions, and tenant improvements incurred by a landlord to fit up space for tenants, either when a new tenant takes possession, or upon lease renewal, at five percent of estimated gross income. The court finds these costs to be credible and supported by the record.

5.      Capitalization Rate.

The capitalization rate is an "income rate for a total real property interest that reflects the relationship between a single year's net operating income expectancy and the total property price or value . . . ." Appraisal Institute, The Appraisal of Real Estate at 462. The capitalization rate is "used to convert net operating income into an indication of overall property value." Ibid.

Plaintiff's expert used both investor surveys and the Band of Investment technique to calculate an overall capitalization rate. The Bank of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding, 16 N.J. Tax at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate 467 (10th ed. 1992)).

> Because most properties are purchased with debt and equity capital, the overall capitalization rate must satisfy the market return

requirements of both investment positions. Lenders must anticipate receiving a competitive interest rate commensurate with the perceived risk of the investment or they will not make funds available. Lenders generally require that the loan principal be repaid through periodic amortization payments. Similarly, equity investors must anticipate receiving a competitive equity cash return commensurate with the perceived risk, or they will invest their funds elsewhere.

[Appraisal Institute, Appraisal of Real Estate 505 (13th ed. 2008).]

In "using the Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Hull Junction Holding, 16 N.J. Tax at 82 (quoting Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 279-80 (1985)). "For these purposes, the Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Id. at 82-83. "Relevant data is also collected and published by . . . Korpacz Real Estate Investor Survey." Id. at 83. "By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

Plaintiff's expert selected a sixty-five percent loan to value ratio and a twenty-five-year amortization period for both tax years. He opined a 5.75 percent interest rate for tax year 2005 and a five percent interest rate for tax year 2006, and an equity return of eleven percent for tax year 2005 and ten percent for tax year 2006. These figures resulted in overall capitalization rates of 8.75 percent for tax year 2005 and eight percent for tax year 2006. The court finds the expert's overall capitalization rates, and the component figures that resulted in those overall rates, to be credible and supported by the record.

6.  Calculation of Value.

Because the court has accepted the elements of plaintiff's expert analysis under the income capitalization approach, the court adopts his overall opinions of value. Thus, for tax year 2005, the true market value of the subject property as of October 1, 2004 was $99,000,000. For tax year 2006, the true market value of the subject property as of October 1, 2005 was $109,000,000.

D.  Applying Chapter 123.

Pursuant to N.J.S.A. 54:51A-6(a), commonly known as Chapter 123, in a non-revaluation year an assessment must be reduced when the ratio of the assessed value of the property to its true value exceeds the upper limit of the common level range. The common level range is defined by N.J.S.A. 54:1-35a(b) as "that range which is plus or minus 15% of the average ratio" for the municipality in which the subject property is located.

The formula for determining the subject property's ratio is:

$$\text{Assessment} \div \text{True Value} = \text{Ratio}$$

1.  Tax Year 2005.

Because the municipality implemented a district-wide reassessment for tax year 2005, Chapter 123 does not apply. N.J.S.A. 54:51A-6(d). The assessment on the subject property, therefore, will be set at 100% of value for that tax year, or $99,000,000. The court will allocate the value between the two parcels in roughly the same percentage as is allocated in the original assessments. Judgments establishing the assessments for the subject property for tax year 2005 will be entered as follows:

Block 5.01, Lot 3.07

| | |
|---|---|
| Land | $ 12,684,000 |
| Improvement | $ 82,752,000 |
| Total | $ 95,436,000 |

20

Block 5.01, Lot 3.08

| | |
|---|---|
| Land | $ 1,814,000 |
| Improvement | $ 1,750,000 |
| Total | $ 3,564,000 |

2.    Tax Year 2006.

For tax year 2006, the formula produces a ratio of 1.8065:

$$\$196,908,500 \div \$109,000,000 = 1.8065$$

The Chapter 123 common level ratio for Plainsboro Township for tax year 2006 is .9868 with an upper limit of 1.00 and a lower limit of .8388. The ratio for the subject property for this tax year is 1.8065, which exceeds the upper limit of the range for this tax year. Consequently, the court will determine the assessment for the subject property for tax year 2006 by multiplying the true value by the Chapter 123 ratio:

$$\$109,000,000 \times .9868 = \$107,561,200$$

The court will round this figure to $107,561,000 and allocate the value between the two parcels in roughly the same percentage as is allocated in the original assessments. Judgments establishing the assessments for the subject property for tax year 2006 will be entered as follows:

Block 1601, Lot 2

| | |
|---|---|
| Land | $ 13,790,000 |
| Improvement | $ 89,901,000 |
| Total | $103,691,000 |

Block 1601, Lot 4

| | |
|---|---|
| Land | $ 1,934,000 |
| Improvement | $ 1,936,000 |
| Total | $ 3,870,000 |