

**TAX COURT OF NEW JERSEY**

JOSHUA D. NOVIN
Judge

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

September 2, 2022

Michael I. Schneck, Esq.
Schneck Law Group, LLC
23 Vreeland Road, Suite 270
Florham Park, New Jersey 07932

Daniel R. Kanoff, Esq.
Eileen Toll, Esq.
Blau & Blau
223 Mountain Avenue
Springfield, New Jersey 07081

> Re:    Redwood LLC v. West Orange Township
>        Docket No. 004966-2018

Dear Mr. Schneck, Mr. Kanoff, and Ms. Toll:

This letter shall constitute the court's opinion following trial of the local property tax appeal instituted by plaintiff, Redwood LLC ("Redwood"). Redwood challenges the 2018 tax year assessment on its unimproved property located in West Orange Township ("West Orange").

For the reasons stated more fully below, the court affirms the 2018 tax year assessment.

## I.    Findings of Fact

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony presented during trial.

### A.    Property information

Redwood is the owner of the unimproved real property located at 200 Pleasant Valley Way, West Orange, Essex County, New Jersey (the "subject property"). The subject property is identified on West Orange's municipal tax map as block 151, lot 33. As of the valuation date, the

   

subject property comprised a square lot containing approximately 5.913-acres or 257,570 square feet of unimproved land.[1]  A 25-foot wide by 561-foot long macadam easement/right of way provides ingress and egress to the subject property from Pleasant Valley Way.[2]  A section of the Peckham River crosses over the front boundary of the subject property, and a bridge was constructed from the macadam easement over the river to provide access to the subject property. The subject property is bordered on two sides by the Montclair Golf Club and on one side by a senior care facility.

Redwood filed a direct appeal complaint with the Tax Court challenging the subject property's 2018 tax year assessment.  West Orange did not file a counterclaim.

As of the October 1, 2017 valuation date, the subject property was in West Orange's R-2 zoning district.[3]  Permitted uses in the R-2 zoning district include: (i) one-family dwellings with a minimum lot area of 40,000 square feet; (ii) water reservoir, well tower, or filter bed; (iii) golf course and golf clubhouse; (iv) farm, nursery, greenhouse, and similar uses; and (v) hospitals.

Redwood's expert (as defined herein) estimated that approximately 1-acre of the subject property is in Flood Hazard Zone AE, and 4-acres are in Flood Hazard Zone AO.  The expert further testified that the subject property includes wetlands; however, neither his testimony nor his appraisal report detailed how many acres or square feet of the subject property comprise

---

[1] The subject property was formerly improved with the Essex Health and Racquet Club.  However, in or about April 2011, a fire destroyed the facility, and the remaining improvements were demolished, leaving only remnants of the macadam.

[2] As set forth in West Orange's Tax Map contained in Redwood's expert's appraisal report and the subject property's survey annexed to the Contract of Sale (as defined herein).

[3] The West Orange zoning map contained in Redwood's expert's appraisal report reflects that the subject property is in West Orange's IHO-2 overlay zoning district.  However, according to Redwood's expert, the overlay zoning was implemented in 2020.






wetlands.[4]

During trial, Redwood offered testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the property valuation field (referred to as "Redwood's expert" or the "expert"). Redwood's expert prepared an appraisal report expressing his opinion of the subject property's true or fair market value as of the October 1, 2017 valuation date.

The subject property's local property tax assessment, implied equalized value, and Redwood's expert's value conclusion is set forth below:

| Valuation date | Local tax assessment (land only) | Average ratio of assessed to true value | Implied equalized value | Redwood's expert's concluded value |
|---|---|---|---|---|
| 10/1/2017 | $3,000,000 | 89.81% | $3,340,385 | $1,620,000 |

### B. Site plan approvals and fair share plan

In or about 2005, Centex Homes, LLC ("Centex") contracted to purchase the subject property from Sussex & Warren Holding Corp. and applied to the West Orange Zoning Board of Adjustment for site plan approvals to construct a 4-story, 68 residential unit condominium complex to be known as "Signature Place." In or about 2006, the West Orange Zoning Board of Adjustment granted site plan approvals (the "Site Plan Approvals"). Redwood's expert testified that a one-year extension of the Site Plan Approvals was granted in or about 2008. Centex apparently then terminated its contract to purchase the subject property; however, it was unclear from the record when such termination occurred. Thereafter, the subject property was shown to

---

[4] Redwood's expert's report contained what was captioned as a "Wetlands Map." However, the map was not certified by an engineer and contained no topographical information or defined wetlands delineation areas.





"seventy-one other developers that looked at the project . . . [but] in the collapse of 2008, no one wanted it." According to the expert, the Site Plan Approvals expired in or about July 2009.

In or about July 2015, West Orange instituted a declaratory judgment action seeking confirmation that its Housing Element and Fair Share Plan was compliant with the Fair Housing Act of 1985, N.J.S.A. 52:27D-30.1, in accordance with In re N.J.A.C. 5:96 & N.J.A.C. 5:97, 221, N.J. 1 (2015) (the "West Orange affordable housing action").

On or about October 23, 2015, Redwood executed a Contract of Sale (the "Contract of Sale") to purchase the subject property from Sussex & Warren Holding Corp. (the "Seller") for $1,250,000.[5] The Contract of Sale recited that there were "delinquent and unpaid and continually accruing municipal real estate taxes totaling, at present, of upwards of $800,000.00 (inclusive of all accrued interest to date) ('Existing Tax Lien'), represent[ing] a paramount lien affecting title to the property."[6]

Redwood and the Seller executed an Addendum to the Contract of Sale, amending the purchase price to $1,625,000 (the "Addendum"). The Addendum further provided that "Buyer is to pay the Existing Tax Lien and take a credit and/or reimbursement from Seller for that amount at time of Closing."

Redwood acquired the subject property from the Seller on May 17, 2016, for reported consideration of $1,625,000. The deed recites that the Seller, by Howard G. Wachenfeld,

---

[5] The Contract of Sale further states that Seller was a party to an "agreement for the sale and purchase of the property" with Commercial Realty Group, LLC, but that such agreement was terminated and is "null and void and of no further force and effect."

[6] The Contract of Sale references a terminated agreement for the sale and purchase of the subject property between Seller and Commercial Realty Group, L.L.C. However, the trial record fails to disclose whether Centex Homes, LLC and Commercial Realty Group, LLC were related entities or whether two different contracts were entered into by purchasers seeking to acquire the subject property and terminated.






President and "Administrator of the Estate of Jerry Turco," was the grantor. The Settlement Statement reflects that as of the closing date, the Seller's Existing Tax Lien obligation amounted to $1,039,639.55, plus past due 1st Quarter 2016 real estate taxes of $26,197.77.

On or about February 6, 2017, Redwood filed an application for preliminary and final site plan approval with the West Orange Zoning Board of Adjustment seeking to construct a "four (4) story multi-family dwelling with 128 units and 285 on-site parking spaces to be known as 'The Redwood', a luxury residential rental community." The application recited that "the development will include such amenities as on-site management and concierge services, security gates, a clubhouse, pool, storage units, high-end appliances with washer and dryer in each unit and a terrace attached to each unit." The site plan application sought bulk (N.J.S.A. 40:55D-70(c)(1) and (c)(2)) and use (N.J.S.A. 40:55D-70(d)) variances and stated that "[a]pproval for a four (4) story multi-family residence was previously approved by the Zoning Board for Centex Homes, LLC under Resolution ZB-05-28." Redwood apparently subsequently withdrew its application for preliminary and final site plan approval; however, the date when such application was withdrawn was again unclear from the trial record.

In or about December 2017, Redwood intervened as a party in the West Orange affordable housing action. On or about April 6, 2020, a settlement agreement was reached in the West Orange affordable housing action delineating West Orange's Third Round Fair Share Housing obligations and how it would satisfy unmet needs.[7] Part of that agreement included implementing,

> overlay zoning on this site [the subject property] permitting non age-restricted development up to 24 du/a and requiring a 20% affordable housing set-aside. The parties agree that this zoning yield shall be

---

[7] Redwood's Answers to Interrogatories, certified July 22, 2020, confirmed its involvement in the West Orange affordable housing action, reciting that "we are currently seeking to have [the subject] property included in [West Orange's] fair share obligation."






permitted to be rounded up to 142 total units, which if developed to that maximum would require an affordable housing set-aside of either a) 28 on-site affordable housing units and a payment in lieu of $59,473.20, or b) 29 on-site affordable housing units.

## II.  Conclusions of Law

### A.  Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Bor., 9 N.J. 167, 174 (1952)). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value; that is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952).

Thus, at the close of Redwood's proofs, the court must be presented with evidence raising a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376. "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Even in the absence of a motion to dismiss, under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessment has overcome the presumption of






validity. If the court concludes that a challenging party has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Affording Redwood all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that Redwood produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of Redwood's expert and the facts upon which he relied raise debatable questions regarding the correctness of the subject property's 2018 tax year assessment.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). Here, although the proofs, when measured against the liberal standards employed in evaluating a motion under R. 4:37-2(b), were sufficient to overcome the presumption of validity at the close of Redwood's case-in-chief, "the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

B.    Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Therefore, the starting point of the court's journey to discern a property's true or fair market value is the highest and best use analysis. See Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988) (concluding that the highest and best use analysis is "the first and most important step in the






valuation process."). The phrase highest and best use has been defined as:

> The <u>reasonably probable and legal use</u> of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [Appraisal Institute, <u>The Dictionary of Real Estate Appraisal</u>, 93 (5th ed. 2010) (emphasis added).]

Thus, the highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." <u>Clemente v. South Hackensack Twp.</u>, 27 N.J. Tax 255, 267-269 (Tax 2013), <u>aff'd</u>, 28 N.J. Tax 337 (App. Div. 2015). <u>See also</u> <u>County of Monmouth v. Hilton</u>, 334 N.J. Super. 582, 588 (App. Div. 2000).

However, a property's highest and best use is not static; rather, it is shaped and impacted by economic and market forces. A property's highest and best use may change over time based on economic changes, a market that is in transition, from underdevelopment or overdevelopment, or from zoning changes. Importantly, the highest and best use of a property "is not determined through subjective analysis by the property owner, the developer, or the appraiser; rather, the highest and best use is shaped by the competitive forces within the market where the property is located . . . the analysis and interpretation of highest and best use is an economic study of market forces focused on the subject property." <u>Entenmann's Inc.</u>, 18 N.J. Tax at 545 (citing Appraisal Institute, <u>The Appraisal of Real Estate</u>, 298 (11th ed. 1996)). <u>See also</u> <u>Acocella v. Cedar Grove Twp.</u>, 29 N.J. Tax 325, 335-36 (2016). In sum, the highest and best use analysis is a concept rooted in the market's perceptions of value, because the question it answers is "[w]hat use would






the market make of that property?" Ford Motor Co., 127 N.J. at 302 (citation omitted). However, the answer "requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses." Clemente, 27 N.J. Tax at 269.

Redwood's expert testified that, as of the October 1, 2017 valuation date, the subject property was situate in West Orange's R-2 zoning district with legally permitted uses that included single-family dwellings with a minimum lot area of 40,000 square feet. In Redwood's expert's opinion, after analyzing the zoning ordinance, "really the only use that meets all the tests of being . . . legally permissible, physically permissible, financially feasible, and maximally productive, is the use for a subdivision of [six single-family] residential development" lots.

However, determining the permissible uses in the zoning district represents only one element of the legally permissible criteria under the highest and best use analysis. "To apply the test of legal permissibility, an appraiser determines which uses are permitted by current zoning, [and] which uses could be permitted if a zoning change were reasonably probable. . . ." Appraisal Institute, The Appraisal of Real Estate, 338 (14th ed. 2013) (emphasis added). Thus, when evaluating the legally permissible criteria an appraiser must place primary emphasis on the legally permitted uses in the zoning district. However, when evidence exists of prior zoning change approvals, or when applications have been made for changes in zoning, the appraiser cannot merely turn a blind eye, declining to analyze the legally permitted uses resulting from the zoning change, or failing to examine what uses would be permitted if the zoning change is reasonably probable. See Clemente, 27 N.J. Tax at 270 (concluding that the expert's "failure to consider the [zoning] approval and permit in his determination of highest and best use means that he did not include and value all of the interests in the subject property").

Here, in evaluating the legally permissible uses of the subject property under the highest






and best analysis, Redwood's expert appropriately contemplated "the allowed uses, . . . legally permissible" uses in the R-2 zoning district. However, according to the expert, "the approvals expired in July of 2009, [and] even if they had used all of their extensions, they would have only been valid to July 2011, our property owner purchased this in 2016, well after the approvals expired. . . ." Thus, in the expert's opinion, because the Site Plan Approvals expired several years prior to the October 1, 2017 valuation date, no further examination of the reasonable probability of a zoning change was required.

However, effective cross-examination disclosed that on February 6, 2017, approximately eight months prior to the October 1, 2017 valuation date, Redwood filed an application with the West Orange Zoning Board of Adjustment seeking to construct a "four (4) story multi-family dwelling with 128 units and 285 on-site parking spaces to be known as 'The Redwood', a luxury residential rental community." That application sought bulk (N.J.S.A. 40:55D-70(c)(1) and (c)(2)) and use (N.J.S.A. 40:55D-70(d)) variances and stated that "[a]pproval for a four (4) story multi-family residence was previously approved by the Zoning Board for Centex Homes, LLC under Resolution ZB-05-28."

Yet, in considering the legally permissible uses of the subject property under the highest and best use analysis, the expert did not analyze the reasonable probability of success of Redwood's application for a zoning change. Moreover, Redwood's expert did not investigate or confer with Redwood's principal, Redwood's engineer, or Redwood's land use attorney regarding Redwood's application. In sum, Redwood's expert gave no consideration to how such proposed zoning change would impact the subject property's use and its true or fair market value as of the October 1, 2017 valuation date. In response to West Orange's cross-examination requesting the expert clarify that he "made no analysis regarding the probability of a zoning change," Redwood's

   

expert candidly responded, "correct."

Thus, despite his observation that Redwood "has intentions to do something else" with the subject property; and Redwood having made application to West Orange, on February 6, 2017, for a zoning change to construct a four (4) story multi-family dwelling with 128 units and 285 on-site parking spaces, Redwood's expert declined to investigate or analyze whether a zoning change was reasonably probable.

Moreover, cross-examination further revealed that documents contained in Redwood's expert's work file disclosed that on or about June 18, 2014, Commercial Realty Group, LLC, a former contract purchaser for the subject property,[8] applied to the New Jersey Department of Environmental Protection for "issuance of Freshwater Wetlands General Permits #2, 10, and 11 to allow for the construction of a 4 story 68[-]unit condominium building."  In addition, the court's review of the expert's work file documents also disclosed that on November 4, 2013,[9] the Hudson-Essex-Passaic Soil Conservation District issued a letter stating the New Jersey Soil Erosion and Sediment Control Act "plan dated 6/28/06 . . . has been extended under the Permit Extension Act of 2012 . . . through April 3, 2017. . . ."  Thus, contrary to the testimony of Redwood's expert, certain permit applications and/or approvals for a 68-unit residential condominium development, and previously issued permits remained valid through April 2017, approximately six months prior to the October 1, 2017 valuation date.

---

[8]  The third Whereas clause under the Contract of Sale between Redwood and Seller recited that Commercial Realty Group, L.L.C. and Seller "were parties to an agreement for the sale and purchase of the Property. . . [and] that such agreement . . . is null and void and of no further force and effect. . . ."  However, no testimony was offered by Redwood's expert regarding the referenced agreement of sale, and the court is unclear of the agreement of sale's date.

[9]  Redwood expert's work file document were moved into evidence by West Orange, without objection, as Exhibit D-12.






Further, in explaining how he arrived at his conclusion that six single-family residential lots were the only legally permissible use of the subject property, Redwood's expert stated that Redwood's principal, Robert Pagano, "is a developer . . . he underwrote this based on 6 residential lots, I believe he has intentions to do something else [with the subject property], but when he bought it, his intention . . . to make sure that he was buying it at fair value, was to underwrite it at 6 residential lots." However, the highest and best use of a property "<u>is not determined through subjective analysis by the property owner</u> . . . The proper determination of highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses." <u>Clemente</u>, 27 N.J. Tax at 268-69 (internal citations omitted) (emphasis added). Thus, contrary to established highest and best use principles, the expert relied on the owner/developer's subjective analysis in forming his opinion of its highest and best use, and not economic or market forces.

Finally, the court further observes that testing the physical possibility component of Redwood's expert's highest and best use analysis required him to "address[] the physical characteristics [like] size, shape, terrain, and accessibility of land . . . frontage and depth" among other factors. Appraisal Institute, <u>The Appraisal of Real Estate</u>, 283 (13th ed. 2008). However, Redwood's expert's conclusion that a six single-family residential subdivision is physically possible on the subject property was not based on an analysis of physical characteristics but rather was premised purely on mathematics. According to Redwood's expert, "we [Robert Pagano and the expert] were of the opinion that the property could be subdivided into 6 residential lots . . . We did it off the total square footage of 257,570, and that's divided by 40,000 square feet, and that gave you 6.4 lots, but some of that's going to be used for roads and things like that, he [Robert Pagano] was under the impression that 6 [residential] lots could be built there, [but] he [Robert

   

Pagano] <u>never had an engineer do any work to verify</u> [whether a six residential lot subdivision was physically possible]. . . ." (emphasis added).

No other testimony was elicited with respect to the practicality of constructing a six single-family subdivision on the subject property, given its topography, potential wetlands, and the subject property's proximity to the Peckham River. Moreover, neither Redwood nor Redwood's expert consulted with any land use attorney, professional planner, engineer, or surveyor in arriving at his physically possible conclusion. Thus, the trial record lacks any empirical evidence demonstrating how many residential building lots could be created based on the subject property's physical characteristics. Without that critical evidence, the court cannot appropriately gauge the reliability and credibility of Redwood's expert's physically possible conclusions.

Accordingly, for the above-stated reasons, the court finds Redwood's expert's legally permissible and physically possible conclusions under the highest and best use analysis are fatally flawed and not credible. The highest and best use analysis is the first, and most critical step, in the property valuation process. <u>See</u> <u>Ford Motor Co.</u>, 10 N.J. Tax at 161. A property must be valued for local property tax assessment purposes at its highest and best use. Here, Redwood's expert has failed to offer cogent, credible, and reliable evidence of the subject property's highest and best use. Therefore, the court need not further evaluate and weigh the valuation evidence presented by Redwood under this local property tax appeal.

C.    <u>Subject property sale</u>

In the court's journey to determine the fair or true market value of a property, the focus of the inquiry is "the fair value of the property, the price a willing buyer would pay a willing seller . . . The answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area." <u>New Brunswick v. State Div. of Tax Appeals</u>, 39 N.J. 537, 543






(1963).  The term market value has been defined as:

> the most probable price, as of a specified date, in cash or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that <u>neither is under undue duress</u>.
>
> [<u>The Appraisal of Real Estate</u>, 58 (14th ed. 2013) (emphasis added).]

Here, according to Redwood's expert, despite the Contract of Sale reciting that the Seller was delinquent in unpaid real estate taxes totaling approximately $800,000, that disclosure was of little consequence to him in gauging whether this was a distressed sale.  Instead, Redwood's expert's examination focused on whether the subject property was "offered to the open market." Redwood's expert testified that, "the subject sale it was actively on the market, because they're [the Seller] under duress doesn't mean that it wasn't properly marketed . . . it didn't sell for market value especially since our buyer bought it, that's their [the Seller's] problem, not my buyer's problem, . . . ."  Thus, after conferring with Redwood's principal, one of the real estate brokers, reviewing the contract of sale, "the deed, the closing statements, there was a brokerage commission paid," in Redwood's expert's opinion, "this was an arms-length transaction."

However, concluding that a transaction was "arms-length" is not synonymous with the detailed investigation and analysis required to conclude that a property was sold for true or fair market value.  Although a property sale reflects an exchange of consideration between parties, it may not be dispositive on the issue of market value.  "[T]here may be instances when the sale price may not reflect true market value.  In such instances it is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value." <u>Glen Wall Assocs. v. Wall Twp.</u>, 99 N.J. 265, 282 (1985).  A property






sale is only "a reliable indicator of fair market value if the following criteria are satisfied:

1) buyer and seller are typically motivated and neither is under duress;
2) buyer and seller are well informed or well advised and are acting prudently, knowledgeably and in their respective self-interests;
3) the property has been reasonably exposed to an open, relevant and competitive market for a reasonable period of time;
4) the purchase price is paid in cash or its equivalent; and
5) the purchase price is unaffected by special or creative financing or by other special factors, agreements, or considerations."

[Venture 17, LLC v. Hasbrouck Heights Bor., 27 N.J. Tax 108, 126 (Tax 2013) (citing Hull Junction Holding Corp., 16 N.J. Tax at 94).]

Hence, an appraiser's opinion that a sale represents true or fair market value must not only focus on whether the buyer and seller were related parties and if the property was adequately exposed to the marketplace. Rather, an appraiser must conduct a thorough investigation of the sale transaction to ascertain the motivations and objectives of the seller and buyer, changing market conditions, and whether the agreed-upon sales price was affected by special considerations, factors, or agreements.

During trial, the evidence disclosed that as of the date of execution of the Contract of Sale, the Seller was indebted to West Orange in real estate tax arrears, plus interest, in the sum of approximately $800,000. In addition, the evidence further disclosed that during the seven months that elapsed from the October 2015 execution of the Contract of Sale to the May 2016 sale, the Seller incurred approximately $265,837.32 in additional real estate taxes and interest.[10] However, Redwood's expert gave little or no consideration to how this factor may have unusually motivated the Seller to execute the Contract of Sale for the subject property and the financial duress

---

[10] The Settlement Statement reflects total tax payments due (inclusive of past due 1st Quarter 2016 real estate taxes) to West Orange of $1,065,837.32 ($1,065,837.32 - $800,000 = $265,837.32).


Interpreter


ADA
Americans with Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



experienced by the Seller.

Cross-examination further disclosed that the Seller instituted tax appeal litigation involving the subject property for the 2011 and 2012 tax years. However, the tax appeals were dismissed by the court because of the taxpayer's failure to pay taxes. See N.J.S.A. 54:51A-1(6). According to excerpts of that opinion read by Redwood's expert into the trial record, the Seller's principal shareholder, Jerry Turco, died in 2005, allegedly leaving owing "approximately $14.75 million in federal estate taxes, and approximately $4.65 million in New Jersey estate taxes," with liquid assets of comprising "about $14,000, and thus . . . little or no liquid assets to discharge these taxes." Despite Redwood's expert acknowledgement during cross-examination that he was unaware of these issues impacting the Seller, he continued to assert that the subject sale was a market sale, stating, "seeing this means nothing to me, since it was marketed, . . . that doesn't change indication that is a true fair market sale."

Moreover, Redwood's expert candidly admitted during cross-examination that the subject property's May 17, 2016 sale was "absolutely, . . . considered" in reaching his opinion of value for the subject property.

Here, although Redwood and the Seller were unrelated parties, and the subject property was offered for sale by a real estate broker and seemingly exposed to the market, the court finds that Redwood's expert failed to credibly demonstrate that the sale price was not materially impacted or affected by other factors or considerations. Although Redwood's expert confirmed the terms of the sale transaction with Redwood, Redwood's expert made no investigation into and did not consult with the Seller, ascertain whether the Seller was typically motivated to sell the subject property or whether the Seller was acting under duress in selling the subject property under the agreed upon purchase price. See Venture 17, LLC, 27 N.J. Tax at 126 (citing Hull Junction






Holding Corp., 16 N.J. Tax at 94).

The act of listing and marketing a property for sale does not satisfy all the criteria for demonstrating that a property was sold for true or fair market value. For instance, a seller may agree to accept an offer substantially below the offered price when the failure to accept such offer may result in extinguishing the seller's equity position in the property. In such circumstances, the seller in accepting the offer, is motivated by financial self-preservation, and thus, is unusually motivated to sell the property, and the property sale is not an accurate representation of true market value. Therefore, the court finds that the subject property's May 2016 sale was not credible evidence of its true or fair market value as of the October 1, 2017 valuation date.

### III. Conclusion

For the foregoing reasons, the court affirms the subject property's 2018 tax year assessment.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




